# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### GREENEVILLE DIVISION

| | | |
|---|---|---|
| **MARK MCCOWN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION NO.** |
| | ) | |
| **v.** | ) | **2:24-cv-00063** |
| | ) | |
| **NORFOLK SOUTHERN RAILWAY** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION
### TO EXCLUDE THE TESTIMONY OF DR. CHRISTOPHER SELLARS

Plaintiff Mark McCown responds as follows to Defendant's motion to exclude the testimony

of Plaintiff's physician life care planner, Dr. Christopher Sellars:

### INTRODUCTION

Plaintiff's lawsuit seeks to recover compensatory damages for personal injuries suffered on

March 8, 2022, while working as a locomotive engineer for Norfolk Southern Railway Company.

Plaintiff's claims are brought under the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51,

*et seq.*, which provides the exclusive remedy for injured railroad workers to recover compensation

from their employers. Compensation for the costs of future medical care is one of the elements of

damages for which Plaintiff seeks to recover.

In support of his claim for the costs of future medical care, Plaintiff retained Dr. Christopher

Sellars to create a life care plan that assesses his future care needs and the costs associated with that

care. Dr. Sellars' life care recommendations represent his professional opinions as to Plaintiff's

1

future medical needs (and the associated costs) related to his work-related injuries, which the parties agree include complex regional pain syndrome.

Seeking to exclude this testimony, Norfolk Southern contends that Dr. Sellars is unqualified, that his methodology is unreliable, and that his conclusions lack an evidentiary basis. In addition, Norfolk Southern seeks to exclude Dr. Sellars because he revised his life care plan to account for testimony in the primary care doctor's deposition taken after the date of his initial life care plan. The revision reduced the costs of the life care plan by a million dollars. Plaintiff respectfully submits the Defendant's criticism go to the weight rather than to the admissibility of Dr. Sellars' testimony and that Defendant cannot establish that it has been prejudiced by the life care plan revision that reduced Plaintiff's damages claim.

### **DOCUMENTS RELIED ON BY PLAINTIFF**

- Dr. Christopher Sellars Curriculum Vitae (Doc. 52-3);

- Catastrophic Life Care Plan, dated June 11, 2025 (Doc. 52-1);

- Catastrophic Life Care Plan, amended December 10, 2025 (Doc. 52-2);

- Deposition of Christopher Sellars, DO, CLCP, taken December 12, 2025 (Doc. 52-8);

- Rule 26 report of Dr. Veena Graff, dated September 4, 2025 (Doc. 52-5, pp.43-50);

- Deposition of Dr. Veena Graff, taken December 5, 2025 (Doc. 52-5); and

- Deposition of Dr. Richard Carter, taken August 22, 2025 (Doc. 52-6).

### **STANDARD OF REVIEW**

The admission of expert testimony is governed by Federal Rule of Evidence 702. Rule 702

2

requires that: (1) the expert be qualified to competently testify regarding the matters he intends to address; (2) the process or methodology used by the expert to reach his conclusions be sufficiently reliable; and (3) the expert's testimony assist the trier of fact, through the application of scientific, technical, or specialized expertise to understand the evidence or to determine a fact in issue. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528-29 (6th Cir. 2008); *Maiz v. Virani*, 253 F.3d 665 (11th Cir. 2001). Applying the criteria of Rule 702 is frequently referred to as a "gate-keeper" analysis.

Rule 702 was amended in 2000 to clarify the Supreme Court's holding in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), but *Daubert* is hardly a "sea change" in the law of evidence. *United States v. 14.38 Acres*, 80 F.3d 1074, 1078 (5th Cir. 1996). "As the Court in *Daubert* makes clear . . . the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system: 'Vigorous cross-examination, presentation of contrary evidence and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id.* (quoting *Daubert*, 509 U.S. at 597). A review of post-*Daubert* case law "shows that the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note to 2000 amendment. As a general rule, objections alleging inadequacies of underlying data for an opinion are more appropriately considered objections that go to the opinion's weight rather than to its admissibility. *See Bazemore v. Friday*, 478 U.S. 385, 400 (1986) ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility."); *Thomas v. Lambert*, 606 F. Supp. 3d 592, 603 (E.D. Mich. 2022) ("[M]ere weaknesses in the factual basis of an expert witness's opinion bear on the weight of the evidence rather than on its admissibility." (quoting *McLean v. 988011 Ont. Ltd.*, 224 F.3d 797, 800-01 (6th

Cir. 2000))). Thus, disagreements between competing experts on the methods used are the proper

subject of cross-examination. *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 45

F. Supp. 3d 724, 755 (N.D. Ohio 2014) (quoting *McLean*, 224 F.3d at 801).

## ARGUMENT

**1.      Plaintiff Mark McCown's Injuries Are Permanent, Painful and Require Lifetime Care.**

In light of some unfortunate misstatements of the evidence in Defendant's motion, it is

important to review the medical testimony concerning the nature and extent of Plaintiff's fall-related

injuries.

Dr. Richard Carter is Plaintiff's primary care doctor. He has been treating Plaintiff for the

injuries Plaintiff sustained related to his fall since the day after it happened. Dr. Carter has

diagnosed Plaintiff with Complex Regional Pain Syndrome ("CRPS"). (Doc. 52-6, pp. 22-23 [depo.

pp. 84-86].). Dr. Carter believes to a reasonable degree of medical certainty that Plaintiff's fall

caused him to develop CRPS and does not foresee Plaintiff's condition getting better. (Id.) The

current pain management regimen that Dr. Carter is providing is "chronic opioids." (Id., p. 15 [depo.

p. 55].) Dr. Carter testified that a spinal cord stimulator remains on the table as a possible treatment

option to get Plaintiff off the Hydrocodone. (Id., p. 11 [depo. p. 40].)

Dr. Veena Graff is the Defendant's retained medical expert. Dr. Graff agrees that the

Plaintiff has CRPS "secondary to the injury which resulted in a fall directly on his bilateral buttocks

that he sustained on March 8th, 2022." (Doc 52-5, p. 47). Dr. Graff describes CRPS as a painful

condition in which the patient's pain signals "constantly fire". (Id., p. 11 [depo. p. 44].) CRPS, she

explains, is a "revved up kind of pain condition that is in overdrive." (Id., p. 12 [depo. p. 45].) In

Dr. Graff's opinion, Plaintiff's CRPS is permanent and will require treatment for the rest of

4

Plaintiff's life. (Id., p. 11 [depo. pp. 41-42].) Dr. Graff acknowledges that there is no cure for CRPS and that well-qualified and caring doctors can have honest disagreements about how best to treat a patient's CRPS. (Id., pp. 12 [depo. p. 45] and 13 [depo. p. 52].) Dr. Graff is not a life care planner, but she agrees that the purpose of a life care plan is to provide treatment going forward that will give the person the best quality of life. (Id., p. 5 [depo. p. 20].) Dr. Graff believes that the Plaintiff would benefit from additional therapies, including: desensitization physical therapy, occupational therapy, cognitive behavioral therapy, psychological and psychiatric therapy for concomitant mood disorder, additional medication (anti-inflammatory mediation, neuropathic agents, serotonin-norepinephrine uptake inhibitors), and interventional therapies (lumbar sympathetic blocks). (Id. pp. 47-48.) Although Dr. Graff does not recommend a spinal cord stimulator for the Plaintiff, she acknowledges that spinal cord stimulators are recognized as an effective treatment option for CRPS and that Penn Medicine, where she works, offers spinal cord stimulators to treat CRPS. (Id. pp. 13 [depo. pp. 51-52] and 19 [dep. 74].)

Thus, the medical testimony is undisputed that Plaintiff has Complex Regional Pain Syndrome as a result of his fall. It is undisputed that Plaintiff's CRPS is permanent. It is also undisputed that Plaintiff will require medical care for the remainder of his life. The only questions are what future medical care does Plaintiff need and what is the cost?

**2.      Dr. Sellars is Well Qualified as a Physician and Life Care Planner.**

Dr. Sellars is a board-certified medical doctor in Physical Medicine and Rehabilitation (PM&R)–*i.e.*, physiatry, which is a medical specialty devoted to diagnosing and treating musculoskeletal, neurologic, and functional impairments arising from traumatic injury. (Doc. 52-3, p. 2). Dr. Sellars is board-certified by the American Osteopathic Board of Physical Medicine &

5

Rehabilitation and has been an Adjunct Clinical Assistant Professor at the Philadephia College of Osteopathic Medicine in Suwanee, Georgia since 2016. (Id., pp. 2-3.) He also serves as an Oral Board Examiner for the American Osteopathic Board of Physical Medicine and Rehabilitation. (Id., p. 1.) He has been a publisher and presenter on the topics of PM&R, Sports Medicine, and Pain Medicine, including being published in the American Academy of Pain Medicine's peer-reviewed journal *Pain Medicine* on the use of spinal cord stimulators, a treatment that he recommends for Plaintiff. (Id., pp. 5-6.) Dr. Sellars has twenty years of active clinical experience evaluating and treating patients. (Id., pp. 2-4.) He is licensed to practice medicine in the State of Georgia and is the President of Sports Medicine Consulting in Peachtree Corners, Georgia, having previously held clinical appointments at Ellis Pain Center and Peachtree Spine Specialists. (Id., p. 2.) In addition to a board-certified medical doctor, Dr. Sellars is a Certified Life Care Planner ("CLCP") as designated by the International Commission on Health Care Certification and is a member of American Academy of Physician Life Care Planners. (Id., pp. 2, 5.)

Defendant's criticisms of Dr. Sellars' qualifications to render opinions on Plaintiff's future medical needs as it relates to his Complex Regional Pain Syndrome ignore the scope and purpose of the field of physiatry, Dr. Sellars' medical training and experience, as well as his testimony.

Q. So you mentioned that you are a physiatrist, can you tell us what that means to you? If you're asked that question in court, what is that?

A. Physiatry or physical medicine and rehabilitation medicine physician is a physician who specializes in rehabilitation medicine, which is a blend of neurology, orthopaedics, as well as rehabilitation medicine. musculoskeletal care, as well as pain conditions, concussions, traumatic brain injury, all of those general subspecialties fall under general rehabilitation medicine. I also did a subspecialty fellowship in sports medicine.

(Doc. 52-8, p. 3 [depo. p. 8]). As a board-certified physiatrist, Dr. Sellars is "uniquely qualified" to

6

render opinions as a physician life-care planner. Physiatrists are expressly recognized by the American Academy of Physician Life Care Planners, the leading professional organization in the field, as providing the medical foundation best suited to the development of comprehensive life care plans:

> Physiatrists are experts in the medical and physical treatment of disabling illness and injury (Bonfiglio, 2009), and have long been recognized as uniquely qualified among medical specialists to provide the scientific and medical foundations essential to the development of life care plans (Pomeranz, 2010).
>
> Physiatrists, by the nature of their training, are holistic and comprehensive in their approach to the assessment of medical and rehabilitation requirements and are well suited to determine what medical conditions remain relevant to a subject's future care considerations (Zotovas, 2014).
>
> . . . . "Physicians specializing in physical medicine and rehabilitation (physiatrists) are uniquely qualified to provide a strong medical foundation for life care planning based on their training and experience in providing medical and rehabilitative services to individuals with disabilities. Physiatrists are, by their training, experienced in dealing with individuals who have catastrophic functional problems. Additionally, physiatrists are trained to anticipate the long term needs of their patients." For these reasons, the American Academy of Physician Life Care Planners advocates the practice of life care planning by board certified physiatrists.

Aaplcp.org, *History & Context: Life Care Planning & AAPLCP*, available at http://aaplcp.org/About/About.aspx (last visited Feburary 25, 2026) (quoting Richard Paul Bonfiglio, The Role of the Physiatrist in Life Care Planning, in *Life Care Planning and Case Management Handbook*, at p. 19 (Roger O. Weed & Debra E. Berens eds., 3d ed. 2019)).[1]

This makes sense because board-certified physiatrists, like Dr. Sellars, are trained, qualified, and licensed to ***independently*** diagnose and treat an array of conditions that produce chronic pain and long-term functional impairment, including Complex Regional Pain Syndrome. Physiatry is

---

[1] The quoted excerpt from *Life Care Planning and Case Management* is attached as "Exhibit 1."

7

well-recognized as one of the medical specialities qualified to treat CRPS. *See Michael J.Z. v. O'Malley*, No. 21 C 6759, 2024 U.S. Dist. LEXIS 168745, at *16 (N.D. Ill. Sep. 19, 2024) (finding that Administrative Law Judge correctly found that an internist "was not a specialist in an area typically familiar with CRPS, such as neurology, physiatry, occupational medicine, or pain management"). Indeed, The Mayo Clinic lists RM&P (physiatry) as one of its departments that treats patients with CRPS, alongside its neurology and pain medicine departments, *see* Complex Regional Pain Syndrome (CRPS): Doctors & Departments, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/crps-complex-regional-pain-syndrome/doctors-departments/ddc-20371157 (last visited Feb. 25, 2026), and Dr. Sellars has treated patients with CRPS during his career as a physiatrist. Although the treatment of CRPS patients may not be the focus of his clinical practice, *Daubert* does not require experts to be "recognized as a leading authority in the field in question. Gaps in expert witness's qualification or knowledge generally go to the weight of the witness's testimony not its admissibility." *Leathers v. Pfizer, Inc.*, 233 F.R.D. 687, 692 (N.D. Ga. 2006) (quoting 29 Wright & Gold, *Federal Practice and Procedure Evidence* § 6265 (West 1997)).

To that point, the fact that Dr. Sellers is qualified and licensed to ***independently*** diagnose and treat individuals with serious injuries and illnesses that result in disabling conditions, like CRPS, fatally undermines Defendant's argument that Dr. Sellars's opinions should be excluded because he did not consult with Plaintiff's treating doctors or doctors who Defendant deem "specialists." Even the case that Defendant implores this Court to follow held that there was no requirement for Dr. Sellars to "consult with treating physicians or independent medical doctors before formulating a life-care plan." *Alfaro v. Panther II Transp., Inc.*, No. H-22-2619, 2024 U.S. Dist. LEXIS 94151,

8

at *15-16 (S.D. Tex. May 24, 2024) (quoting *Fuselier v. Everest Nat'l Ins. Co.*, 2021 U.S. Dist. LEXIS 139124, 2021 WL 3179810, at *2 (W.D. La. July 26, 2021)); *see also Encarnacion v. Heartland Express, Inc.*, No. 2:19-cv-02745-MSN-tmp, 2021 U.S. Dist. LEXIS 129179, at *10 (W.D. Tenn. July 12, 2021) (rejecting argument that life care planner must confer with the patient's treating physicians to render reliable opinion); *Box v. Causey*, No. 1:24-CV-3766-TWT, 2025 U.S. Dist. LEXIS 234358, at *9 (N.D. Ga. Dec. 2, 2025) (same).

**3.      Dr. Sellars Employed Reliable Principles and Methods.**

**a.      Dr. Sellars' Methodology**

In assessing the reliability of an expert's testimony, the Court's focus must be "solely on principles and methodology, not on the conclusion that they generate." *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) (quoting *Daubert*, 509 U.S. at 595). In other words, an expert's testimony is admissible so long as the process and technique the expert used in formulating the opinion is reliable. *See In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 742 (3rd Cir. 1994). The test of reliability is a "flexible" one, and the *Daubert* factors do not constitute a "definitive checklist or text." *Kumbo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999) (quoting *Daubert*, 509 U.S. at 593). The particular factors that a court considers must be tailored to the facts of the particular case and will depend upon the unique circumstances of the expert testimony at issue. (*Id.* at 151-152.)

Here, the expert testimony at issue is a physician life care planner's recommendations for a patient who all medical doctors agree will require lifetime medical care for CRPS. Dr. Sellars formulated his life care recommendations for Plaintiff "in accordance with the Tenets, Methods, and Best Practices advocated by the American Academy of Physician Life Care Planners." (Doc. 52-1,

9

p. 5.)  "This published, reliable, and regularly employed peer-reviewed methodology is widely accepted within the discipline of life care planning; and it has been reliably employed in thousands of state and federal courts throughout the United States." (Id.)  According to the Tenets, Methods, and Best Practices, the life care planner's aim is to achieve the Clinical Objectives of Life Care Planning by answering the Basic Questions of Life Care Planning.  (Id., p. 4.)  The Clinical Objectives of Life Care Planning are: (1) diminish or eliminate physical and psychological pain and suffering; (2) reach and maintain the highest level of function given an individual's unique circumstance; (3) prevent complications to which an individual's unique physical and mental conditions predispose them; and (4) afford the best quality of life in light of their condition.  (Id., pp. 4-5 (citing American Academy of Physician Life Care Planners, *A Physician's Guide to Life Care Planning: Tenets, Methods, and Best Practices for Physician Life Care Planners*, American Academy of Physician Life Care Planners, Austin, Texas, 2017)).  The Basic Questions of Life Care Planning are: (1) what is the subject's condition? (2) what medically-related goods and services does a subject's condition require? and (3) how much will the medically-related goods and services cost over time?  (Id., p. 5.)

This methodology has been summarized into a three stage process in the peer-reviewed medical journal *PM&R: The Journal of Injury, Function, and Rehabilitation*:

> Stage 1 includes collecting and reviewing medical records and performing personal interviews and/or physcial examinations of the subjects.  It is in this stage when the physician life care planners consider objective findings (data from medical records, diagnostic studies, and information obtained during their own clinical examinations) and their impact on the subject's current and/or future health and function.

> Stage 2 involves formulation of diagnostic conclusions, development of opinions regarding impairment, disability, comorbidities, life expectancy, and evidenced-based recommendations for future medical care. Future care categories customarily include

10

items such as physician services, routine diagnostics, medications, laboratory studies, rehabilitation services, equipment and supplies, nursing and attendant care, environmental modifications, household services, and acute care services.

Stage 3 requires conducting vendor surveys to obtain cost data for future care recommendations and using such data to perform cost calculations that result in quantitative conclusions. Accepted methodologies require sample data from sources that are geographically proximate to the subject's primary residence or location of probable care.

(See Exhibit 2, Joe G. Gonzales & Andrea Zotovas, *Life Care Planning: A Natural Domain of Physiatry*, 6 PM&R 184 (2014).) As demonstrated below, Dr. Sellars formulated his opinions in accordance with this accepted peer-reviewed methodology.

> **b. Dr. Sellars Applied This Accepted Three-Step Methodology in Formulating His Opinions.**

In accordance with Stage 1 of the methodology, Dr. Sellars reviewed all available medical records and personally interviewed and examined the Plaintiff. Dr. Sellars identified the records that he reviewed and summarized their contents (51 pages) in his life care plan. (Doc. 52-1, pp. 10-61.) These records confirmed that Plaintiff was diagnosed with CRPS by Dr. Carter and doctors at the Vanderbilt Spine Center. (Id., pp. 25-27.) The records confirmed that Plaintiff's current CRPS treatment regimen was Hydrocodone (10 mg) twice a day and that Dr. Berkman at Vanderbilt had recommended weaning him off opioids for reasons related to the risk of opioid-induced hyperalgesic syndrome, a condition where prolonged opioid use paradoxically increases a patient's sensitivity to pain. (Id.) Dr. Sellars interviewed Plaintiff and performed a physical examination of him on March 27, 2025, the results of which he recorded in his life care plan. (Id., pp. 63-75.) Significant findings from the interview included that Plaintiff "experiences pain that is intolerable despite the treatments that he has received including medications, injections,

11

and physical therapy. His pain persists and interferes with his daily activities." (Id., p. 63.) Plaintiff also endorsed anxiety and depression from the pain. (Id., p. 61.) The physical examination revealed abnormal sensation (allodynia and hyperalgesia), skin discoloration and swelling, and pain in the Plaintiff's left leg. (Id., pp. 71-75.)

In accordance with Stage 2 of the methodology, Dr. Sellars applied his education, training and years of experience as a board-certified physiatrist and CLCP to his Stage 1 findings. His diagnostic conclusions, as outlined in the life care plan, included: CRPS due to the injury at work on March 8, 2022; chronic pain syndrome with anxiety; deficits in mobility and activities of daily living; lumbar spine sprain; and, left ankle sprain. (Id., p. 76.) For the probable duration of care, Dr. Sellars used 22 years which was the Plaintiff's life expectancy per the *United States Life Tables 2022*, Volume 74, Number 2, published by the National Center for Health Services. (Id., pp. 78-79.) Dr. Sellars did not adjust the Plaintiff's life expectancy for comorbidities because at that time he did not believe that they would impact his life expectancy. (Id.) Specifically, he believed that Plaintiff's diabetes was relatively well-controlled and would not impact his life expectancy. (Doc. 52-8, pp. 11-12 [depo. pp. 41-43].) As for Dr. Sellars' future medical care recommendations, he included physician services, routine diagnostics, medications, laboratory studies, rehabilitation services, equipment and supplies, home health care after age 70, and a spinal cord stimulator. (Doc. 52-1, pp. 81-105.)

In accordance with Stage 3 of the methodology, Dr. Sellars sourced the costs in the plan for Plaintiff's geographic area using the Context 4 Healthcare UCR Database. (Doc. 52-1, pp. 86-91). This database is the largest publically available database of its kind in the United States, and it is used by hundreds of healthcare organizations across the country, including some of the nation's

12

largest payers, such as insurance companies. (Id.)

Two months after Dr. Sellars submitted his initial report, Dr. Carter agreed during his deposition that "[e]stimates suggest that people with diabetes die on average six years earlier than people without diabetes." (Doc. 52-6, p. 18 [depo. p. 68].) When Dr. Sellars became aware of this testimony, he called Dr. Carter to discuss Plaintiff's diabetes. (Doc. 52-8, pp. 11-12 [depo. pp. 40-44.] Based on his discussion with Dr. Carter, Dr. Sellars subsequently updated his report. (Id.) Specifically, Dr. Sellars reduced the duration of the life care plan from 22 years to 10 years, which eliminated all future life care costs after Plaintiff reached age 70. The net effect of his doing so reduced the total cost projection from $1,428,527.69 to $464,372.22. (Doc. 52-1, p. 110; Doc. 52-2, p. 127.)

Defendant's argument that Dr. Sellars' opinions is based on "insufficient data" because he originally assessed Plaintiff a "0% life expectancy adjustment" ignores that Dr. Sellars updated his initial report and reduced his life expectancy projection *by twelve years* after a discussion with Dr. Carter concerning Plaintiff's diabetes and health. Further, "as many courts have held, disagreements over the factual assumptions underlying expert testimony-particularly in connection with life expectancy estimates-go to the weight of the testimony, not its admissibility." *Mincey v. Se. Farm Equip. Co.*, No. 4:24-cv-05121-JD, 2025 U.S. Dist. LEXIS 165687, at *31 (D.S.C. Aug. 25, 2025) (citing *Barnett v. United States*, No. 2:20-CV-02517-DCN, 2021 U.S. Dist. LEXIS 233392, at *3 (D.S.C. Oct. 28, 2021); *Moore v. BPS Direct, LLC*, No. 2:17-cv-3228-RMG, 2019 U.S. Dist. LEXIS 112322, at *5 (D.S.C. July 8, 2019); *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 809 (7th Cir. 2013)).

Other than to criticize Dr. Sellars for not consulting with other doctors (which there is no

requirement to do), Defendant offers no real argument that the three-step, peer-reviewed methodology endorsed by American Academy of Physician Life Care Planners is unreliable or that Dr. Sellars failed to follow this methodology in formulating his opinions on Plaintiff's future medical needs. Sure, Defendant's retained life care planner, a *non-physician*, believes that Dr. Sellars, a *board-certified physiatrist*, should have done more, (doc. 53, pp. 18-21), but that is merely a disagreement between competing experts on best methods, which is the proper subject of cross-examination. *See In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 45 F. Supp. 3d at 755; *Box*, 2025 U.S. Dist. LEXIS 234358, at \*14 (N.D. Ga. Dec. 2, 2025) ("To the extent [the parties' life care planners] disagree on what constitutes acceptable practice on this topic, that is a question of credibility rather than admissibility."); *Woodall v. W. Express, Inc.*, 2025 U.S. Dist. LEXIS 78454, 2025 WL 1191783, at \*2 ("District courts within the Tenth Circuit have found that alleged shortcomings in the data used to create life care plans go to the weight, not the admissibility, of the life care plan and testimony of the life care planner.").

4.      *Alfano* **and** *M/V AET Excellence* **Are Distinguishable.**

Defendant cites two cases out of the Southern District of Texas, *In re M/V AET Excellence*, No. 3:23-cv-00167, 2025 U.S. Dist. LEXIS 260542 (S.D. Tex. Dec. 17, 2025) and *Alfaro v. Panther II Transp., Inc.*, No. H-22-2619, 2024 U.S. Dist. LEXIS 94151 (S.D. Tex. May 24, 2024), where Dr. Sellars' opinions on future medical care were excluded for the same reason. Apparently, in both cases, the record lacked evidence where Dr. Sellars explained how he reached his opinions on the patient's future medical needs.

That is not the case here. Dr. Sellars sat through a deposition where defense counsel went through his recommended future care item-by-item, and Dr. Sellars explained the bases for these

14

treatment recommendations. (See doc. 52-8.) As just a few examples:

- Defendant's experts dispute Dr. Sellars' recommendation of a spinal cord stimulator. (Doc. 53, at p. 24.) Dr. Sellars' explained that he recommends a spinal cord stimulator because it is emerging as "a very mainstream treatment for CRPS because of its efficacy" in pain management, (doc. 52-8, at p. 15 [depo. pp. 54-55]), and because of the medical consensus that Plaintiff needs to find non-opioid alternatives to manage his pain, (Id. at p. 25 [depo. p. 97]).

- Defendant's experts dispute Dr. Sellars' recommendation of Tylenol, Meloxicam, and Tramadol to manage Plaintiff's pain because he does not currently use these medications; rather, "he uses ibuprofen, 2-3 times per week to supplement to use of Hydrocodone." (Doc. 53 at p. 23.) Dr. Sellars explained that he recommends these medications because of Plaintiff's need to start weaning off opioids and to give his kidneys a break from his high intake of ibuprofen. (Doc. 52-8, p. 22 [depo. pp. 84-85].)

- Defendant's experts also dispute Dr. Sellars' recommendation that Plaintiff undergo annual DEXA scans to measure bone mineral density. (Doc. 53 at p. 23.) Dr. Sellars explained that DEXA scans are warranted because CRPS predisposes patients to osteoporosis, particularly patients that are Plaintiff's age.

- Defendant's experts dispute Dr. Sellars' recommendation that Plaintiff undergo annual dermatology evaluations. (Doc. 53 at p. 22-23.) Dr. Sellars explained that he recommends these evaluations due to the evidence of nail brittling and erythema on Plaintiff's affected leg and the well-documented evidence of CRPS causing dermatologic conditions. (Doc. 52-8, at p. 20 [depo. pp. 74-75].)

Defendant criticizes Dr. Sellars' recommendations to treat Plaintiff's depression and anxiety that results from the chronic, unrelenting pain from CRPS. (Doc. 53, p. 23.) Dr. Sellars' recommendations for psychiatric care, psychological counseling and medications to treat Plaintiff's injury-related mental health conditions are not unreasonable or novel. Defendant's own medical expert agrees that Plaintiff would benefit from each of these therapies. (Doc. 52-5, p. 15 [depo. p. 60].) Dr. Sellars' recommendations for Plaintiff to receive this care for life is evidence-based given that it is undisputed that his CRPS is permanent and there is no cure for this painful condition.

15

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that Defendant's Motion to Exclude Dr. Sellars be denied.

**Respectfully submitted,**

**BURGE & BURGE, P.C.**

/s/ F. TUCKER BURGE, SR.
F. TUCKER BURGE, SR.
F. TUCKER BURGE, JR.
2001 Park Place #1350
Birmingham, AL   35203
(205)251-9000
(205)323-0512 (Facsimile)
Email:  tucker@burge-law.com
   ftbjr@burge-law.com

BEN W. HOOPER III
CAMPBELL & HOOPER
BPR#013831
335 East Main Street
Newport, TN   37821
(423)623-3082
Email:  bwh3rd@yahoo.com
COUNSEL FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of February, 2026, a copy of the above and foregoing document was served via electronic email to:  Emily L. Herman-Thompson, ethompson@arnettbaker.com, and Jackson Tidwell, jtidwell@arnettbaker.com, Arnett, Baker, Draper & Hagood, LLP, 800 South Gay Street, Suite 2300, Post Office Box 300, Knoxville, TN 37929-2300 and bwh3rd@yahoo.com, Ben W. Hooper III, 335 East Main Street, Newport, TN 37821.

/s/ F. TUCKER BURGE, SR.
OF COUNSEL

16