| | |
|---|---|
| MARK MCCOWN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )       **2:24-CV-63** |
| | ) |
| NORFOLK SOUTHERN RAILWAY | ) |
| COMPANY., | ) |
| | ) |
| Defendant. | ) |
| | ) |

### MEMORANDUM OPINION AND ORDER

Defendant has filed a Motion to Exclude Certain Calculations from Plaintiff's Economist, Dr. Robert McLeod. [Doc. 54]. Plaintiff filed a response in opposition [Doc. 92] along with exhibits in support [Doc. 90], to which Defendant filed a reply. [Doc. 96]. For the reasons stated below, Defendant's Motion [Doc. 54] is **DENIED**.

## I. BACKGROUND

On March 8, 2022, Plaintiff was working as a locomotive engineer for Defendant at the Bulls Gap, Tennessee Rail Yard. Plaintiff was standing on the ballast slope next to the track when the rock he was standing on gave way and Plaintiff fell onto his backside. Plaintiff immediately experienced pain upon his fall and developed a condition called Complex Regional Pain Syndrome ("CRPS") due to the fall. Plaintiff filed this suit against Defendant pursuant to the Federal Employers' Liability Act ("FELA") asserting that his fall and subsequent injury were due, at least in part, to Defendant's negligence. While the parties do not dispute that a causal relationship exists between Plaintiff's fall and his CRPS diagnosis, they do dispute whether any negligent act or omission by Defendant contributed to Plaintiff's fall.

1

In this suit, Plaintiff is seeking compensatory damages for his injuries and retained Dr. Robert McLeod to calculate his past and future economic losses. Dr. McLeod prepared two reports: a Personal Injury Economic Damages Report ("Personal Injury Report") [Doc. 54-3] and a Life Care Plan Economic Report ("Life Care Report") [Doc. 54-10]. Dr. McLeod also prepared supplements that assumed Defendant was totally disabled and would have no future income as well as assumed Defendant is only partially disabled and will be able to engage in part-time work in the future. [Doc. 54-7].[1]

Defendant does not argue that Dr. McLeod is unqualified, nor do they contest the relevancy of his testimony. However, Defendant does assert that Dr. McLeod's testimony should be excluded in its entirety as unreliable because his calculations "reflect shifting computational approaches, revised ratios, inconsistent tax modeling, and reliance on speculative life care inputs." [Doc. 96, p. 1]. In response, Plaintiff acknowledges that Dr. McLeod's initial report contained some minor mathematical errors that were corrected via a supplemental report and contends that Dr. MeLeod's methodology is sound. [Doc. 92, p. 2]. In its reply, Defendant contends that Plaintiff "materially understates the substance" of Defendant's motion by seeking to "recast" it as a mere mathematical issue. [Doc. 96, p. 1].

## II.     APPLICABLE LEGAL STANDARD

The admission of expert testimony is governed by Federal Rule of Evidence 702, which provides general standards to assess reliability as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

---

[1] Defendant notes that Dr. McLeod testified during his deposition that "the calculations in both reports cannot be simultaneously correct." [Doc. 54, p. 2]. However, it is not for Dr. McLeod to determine Plaintiff's level of disability, so the Court cannot find fault with him for issuing reports which address both possibilities. As often as not in litigation, parties make alternative requests for relief.

2

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b)the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Put another way, there are essentially 3 requirements that must be met for expert testimony to be admissible: "(1) the expert be qualified by knowledge, skill, experience, training, or education; (2) the expert's testimony be relevant such that it will assist the trier of fact; and (3) the expert's testimony be reliable." *Endless River Techs., LLC v. TransUnion, LLC*, No. 23-3087, 2025 WL 233659, at \*5 (6th Cir. Jan. 17, 2025) (quoting *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528-29 (6th Cir. 2008)) (internal quotations omitted). Generally, reliable testimony must be based upon "sufficient facts or data" and be the "product of reliable principles and methods" that were reliably applied to the facts of the case. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (quoting Fed. R. Evid. 702). Additionally, *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) provided a non-exhaustive list of factors to consider in assessing reliability, including "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (quoting *United States v. Langan,* 263 F.3d 613, 621 (6th Cir.2001)). The court may also consider whether the expert opinions offered were prepared solely for litigation. *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 434 (6th Cir. 2007). Still, the test for reliability is flexible, and may be tailored to the facts of each case. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008).

The party offering the evidence bears the burden of showing it meets each of Rule 702's requirements by a preponderance of evidence. *In re: Onglyza (Saxagliptin) and Kombiglyze*

3

*(Saxagliptin and Metformin) Prod. Liab. Litig. v. Bristol-Myers Squibb Co,* 93 F.4th 339, 345 (6th Cir. 2024). While the party offering the evidence bears the burden of demonstrating reliability, the Sixth Circuit has made it clear that "'rejection of expert testimony is the exception rather than the rule.'" *U.S. ex rel. TVA v. An Easement and Right-of-Way over .98 Acres of Land,* No. 3:25-CV-00037-DCLC-DCP, 2025 WL 2449277, at *3 (E.D. Tenn. Aug. 25, 2025) (quoting *U.S. ex rel. TVA v. 1.72 Acres of Land in Tenn.,* 821 F.3d 742, 753 (6th Cir. 2016)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 596 (1993). Ultimately, "[a] trial judge has broad discretion in the matter of the admission or exclusion of expert evidence." *United States v. Demjanjuk*, 367 F.3d 623, 633 (6th Cir. 2004) (quoting *United States v. Jones,* 107 F.3d 1147, 1151 (6th Cir.1997)).

## III.    ANALYSIS

As an initial matter, the Court notes that although Defendant pointed out Dr. McLeod's mathematical errors as a marker of unreliability in its Motion to Exclude [Doc. 54, p. 3], its Reply [Doc. 96] to Plaintiff's Response [Doc. 92] clarifies that Defendant "does not seek exclusion because of those [mathematical] errors" and all alleged mathematical errors were corrected through supplemental reports. [Doc. 96, p. 1]. Thus, the Court will not consider Dr. McLeod's initial calculation errors in assessing the reliability of his reports.

### a.  Personal Injury Economic Damages Report

In attacking Dr. McLeod's Personal Injury Report, Defendant first argues that the methodology used in calculating Plaintiff's loss of fringe benefits is flawed. [Doc. 54, p. 11].[2]

---

[2] Defendant does not directly challenge Dr. McLoed's calculation of Plaintiff's lost wages.

Defendant asserts that Dr. McLeod treated Plaintiff's fringe benefits as a constant percentage of his future earnings, a premise which Defendant asserts is unsupported. Instead, Defendant asserts that "[m]edical benefits are typically determined by plan selection, coverage tier, negotiated rates, and premium costs, not by an employee's annual take home pay." While Defendant may be correct that the actual value of fringe benefits is based on these factors while an employee is still receiving those benefits, the value of those factors is impossible to know in the future, so it is necessary for an expert to use other tangible information to calculate the value of future lost fringe benefits.

Defendant also asserts that Dr. McLeod relied on anecdotal evidence from a "single-year snapshot of 2024 benefits cost data," and that relying on "outlier" anecdotal information is improper. [Doc. 54, p. 11; Doc. 96, p. 3]. Defendant misstates the data upon which Dr. McLeod relied. As explained in his declaration, Dr. McLeod relied on information provided by Defendant regarding the cost of employee fringe benefits from 2015 through 2024 and determined the annual cost increase to Defendant of 6.92%. [Doc. 90-6, p. 3-4]. Dr. McLeod then used Plaintiff's 2024 earnings, the most recent earnings information available, to determine the percentage of Plaintiff's earnings relative to his compensation. *Id.* at 4. Dr. McLeod did not, as Defendant's motion suggests, use only data from a single year to calculate the value of fringe benefits.

Next, Defendant argues that Dr. McLeod's methodology "lacks internal consistency." [Doc. 54, p. 12]. Specifically, Defendant asserts that Dr. McLeod averaged multiple years of historic data in assessing Plaintiff's future tax rate, but used a single, "cherry-picked" year in determining lost fringe benefits. [Doc. 54, p. 12]. As stated above, Defendant's assertion that Dr. McLeod relied on data from a single year to determine fringe benefits is not wholly supported by the record. Defendant also argues that Dr. McLeod failed to offer a substantive explanation of his approach to calculating fringe benefits. [Doc. 54, p. 5]. More specifically, Defendant asserts that

5

when questioned about his approach Dr. McLeod merely stated that's the way he's historically calculated lost fringe benefits. *Id.* However, Dr. McLeod further explained that benefits are a percentage of earnings, so calculating lost fringe benefits based on that percentage is "a fairly standard approach." [Doc. 54-2, p. 10]. Dr. McLeod further explained that this is a conservative approach to estimating lost fringe benefits because insurance costs typically increase at a higher annual rate than annual wage increases but he chose to the lower percentage of wage-growth rate instead of the higher benefit costs growth rate that he calculated based on the benefits cost data he was provided. [Doc. 90-6, p. 5-6]. Defendant argues that "a far more reasonable approach is to tie any increase to the projected inflation rate or healthcare-related costs indices, not wage growth." [Doc. 54, p. 7]. However, Defendant did not cite any authority to support this contention, nor did Defendant cite any authority demonstrating that the methodology used by Dr. McLeod has been found by a court to be unreliable.

Dr. McLeod is a well-qualified economist who provided detailed descriptions of his methods and reasoning in his reports, deposition, and declaration. *See* [Docs. 54-1; 54-2; 90-6]. The mere existence of another method of calculation does not make the method used by Dr. McLeod unreliable or not generally accepted among economists. As such, the Court is not persuaded by Defendant's assertions that Dr. McLeod's methodology is unreliable. The existence of other methodologies that Dr. McLeod chose not to apply is fodder for cross-examination, but it does not warrant the exclusion of his testimony.

### b. Life Care Plan Economic Damages Report

Defendant argues Dr. McLeod's Life Care Plan Report should be excluded because it is based upon data from the Life Care Plan prepared by Plaintiff's expert witness Dr. Christopher Sellars which Defendant argues is unreliable. Defendant filed a separation motion to exclude Dr.

6

Sellars' testimony [Doc. 52] which the Court denied [Doc. 120]. As such, Defendant's argument that Dr. McLeod relied upon "inadmissible medical projections" is now moot. As to the portion of Dr. McLeod's report that addresses pretrial expenses, Defendant argues that "the jury is fully capable of independently reviewing medical bills and adding up the medical expenses incurred by Plaintiff without the assistance of an economist." [Doc. 54, p. 13. While this may be true, the Court does not agree with Defendant's argument that the inclusion of pretrial damages in Dr. McLeod's report risks confusing the issues and misleading the jury so long as the pretrial damages are the sum of medical expenses Plaintiff has actually incurred to this point. Defendant also argues that Dr. Sellars' report includes hypothetical *pretrial* expenses that Plaintiff never received. [Doc. 96, p. 7]. Any testimony that Plaintiff's pretrial damages is based upon hypothetical pretrial treatment that Plaintiff did not receive will be excluded.[3] At the same time, even a treatment that was declined pretrial may still be a necessary treatment in the future based on Plaintiff's changing needs and responses to other treatments. As such, it is permissible for Dr. McLeod's Life Care Plan Report to include the cost for treatments Plaintiff has previously declined in his calculation of post-trial expenses unless it is a treatment that Plaintiff has stated he will not consider in the future. Defendant may renew its objection regarding any specific cost contained in Dr. McLeod's report that it believes is excludable based upon the rulings contained herein.

## IV.     CONCLUSION

Accordingly, Defendant's Motion [Doc. 54] is **DENIED** but may be renewed before trial as to any specific costs contained in Dr. McLeod's report that Defendant contends are not in keeping with the ruling herein. Further, Defendant may renew its objection during trial if Dr. McLeod's trial testimony calls into question costs included in his report in a new way or if

---

[3] In making this argument, Defendant did not provide any examples of pretrial costs that were included in Dr. McLeod's report that were not actually incurred by Plaintiff.

Defendant believes that it can show that any part of Dr. McLeod's testimony is not in keeping with the general standards of admissibility for expert testimony. Additionally, in making this ruling the Court is not in any way limiting Defendant's ability to engage in vigorous cross examination of Dr. McLeod at trial utilizing the issues raised in seeking to exclude his opinion testimony.

SO ORDERED:

/s/Cynthia Richardson Wyrick
United States Magistrate Judge